CHARLES K. CONROY *et al.*, Plaintiffs, v. THE SHERWIN-WILLIAMS COMPANY, Defendant and Third–Party Plaintiff-Appellant (Phillips Electric, Inc., Third–Party Defendant-Appellee).

First District (4th Division)   No. 87—1325

Opinion filed March 24, 1988.

334

Edmund W. Sinnott and Michael H. West, both of Chicago (Pope, Ballard, Shepard & Fowle, Ltd., of counsel), for appellant.

James A. Fletcher and Christopher W. Flynn, both of Chicago (Isham, Lincoln & Beale, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Charles Conroy, an electrician, was severely injured while he was cleaning electrical equipment at a Sherwin-Williams Company industrial plant. Sherwin-Williams had hired Phillips Electric, Inc., to assist it in locating and correcting a fault in an underground cable. Phillips hired Conroy as an independent contractor. Following Conroy's injury and the institution of litigation, Sherwin-Williams settled the claim. As third-party plaintiff, Sherwin-Williams sought contribution from Phillips on the basis that Phillips shared control over the work and owed Conroy a duty that it breached.

The trial court allowed the cause to go to the jury, which returned a verdict finding Phillips to be 20% at fault for Conroy's injuries. Upon Phillips' post-trial motion, however, the trial court entered judgment notwithstanding the verdict in favor of Phillips and against Sherwin-Williams.

On appeal, Sherwin-Williams contends that the trial court erred, because: (1) Phillips exercised sufficient control over the work to impose a duty to exercise that control with reasonable care; (2) Phillips assumed a duty to exercise reasonable care for the safety of Conroy through conduct which caused Conroy to rely upon Phillips; (3) Phillips had substantially more experience and expertise in the cleaning of electrical equipment than did Conroy; (4) Phillips had a nondelegable duty to Conroy because of the inherently dangerous activity involved; and (5) Phillips' duty of ordinary care extended to Conroy as well as third persons.

We affirm.

BACKGROUND

Sherwin-Williams owns and operates an industrial plant on the south side of Chicago. The plant consists of several buildings which are powered by a high-voltage electrical distribution system. The buildings are supplied with electricity by a "looped" system, which means that certain of the electrical substations can be supplied with high voltage from either of two independent underground cables. There are approximately a dozen electrical substations in the system.

On November 20, 1982, there was a power failure in a portion of

the system. Sherwin-Williams, which had 12 to 15 electricians on its staff, hired Phillips to assist in the correction of the fault. Phillips in turn engaged Charles Conroy, an electrician who specialized in testing high-voltage cables.

The incident occurred at substation E3, which consists of three cabinets, each of which is seven to eight feet high and perhaps five feet wide. These cabinets house electric switches and transformers. The main source of power for substation E3 is cable 11, which had experienced a loss of power resulting from the fault in the system. There was no power loss in the alternative or "backfeed" cable.

Walter Golut, Sherwin-Williams' manager of site maintenance, inspected the system when the power loss was noticed. He put Steve Rukavina in charge of correcting the problem. Rukavina, who had worked with the system as an electrical engineer for almost 20 years, was the person who knew the most about the system and its operation. Golut told Rukavina to hire an electrical contractor to work with Sherwin-Williams personnel.

Rukavina telephoned Ed Phillips, president of Phillips Electric, Inc., which is an electrical contractor that performs residential, commercial and industrial electrical work. Rukavina told Mr. Phillips that he needed someone to do high-voltage testing and cable splicing if necessary. Following that call, Phillips sent Robert Bonzani, a foreman, and Bernie Lubawy, superintendent, to Sherwin-Williams. In addition, Phillips engaged Conroy to assist.

Conroy was a high-voltage tester who had formed his own business after a number of years working as an electrician. His work required specialized training and equipment. As a tester, he often worked with high-voltage equipment like the Sherwin-Williams 12,000-volt system. Phillips, on the other hand, did not generally work on high-voltage systems and when it did, it hired Conroy or another high-voltage specialist.

Before Conroy and the men from Phillips arrived at the plant, Sherwin-Williams personnel took a high-voltage kit to substation E3. This kit contained safety equipment that was required to be taken to a substation whenever work was to be done so that the workers could check to be sure that the equipment was not energized. Rukavina and an assistant also removed a padlock from the oil switch that powered the substation's backup cable. They moved the switch into the "off" position in order to cut the flow of electricity to the substation.

When Lubawy, Bonzani and Conroy arrived, Rukavina explained the nature of the problem. He told them that both of the two cables that powered substation E3 were dead, the main cable because of the

fault and the alternate cable because the switch was off.

After the briefing, Rukavina's assistant opened the three cabinets at the substation and checked them using a statusscope or wand. Conroy then double-checked all of the switchgear to be certain that there was no electricity energizing the system.

Both Rukavina and Lubawy directed Conroy's activities, telling him what to test and where.

After the men had worked for some time they thought they found the source of the fault, at substation J. The cables running into that substation were disconnected. The group then returned to substation E3 to close up. Unbeknownst to Conroy and the men from Phillips', Rukavina and his assistant turned the oil switch back on, thereby energizing the backfeed into the substation.

Before the men quit working for the night the power failed again and they realized that they had to do more testing at substation E3. However, they decided to resume work the next day.

After everyone returned the next morning they discovered the source of the fault, at substation J. Lubawy, Bonzani, Conroy, Rukavina and another Sherwin-Williams electrician went back to substation E3. Rukavina decided that the switchgear in the cabinets should be cleaned so that Conroy could make a final test to ensure that the fault had in fact been found and isolated. Lubawy and Bonzani began cleaning switchgear in two of the cabinets. Conroy went over to the third cabinet, the one where the backfeed cable came in. He came into contact with switchgear connected to the live cable, which had been reenergized the night before when the switch was turned back on. Conroy was severely burned on both arms, resulting in their amputation above the elbows.

At the close of the evidence, Phillips moved for a directed verdict, arguing that based on the record it did not owe Conroy a duty to test the equipment or a duty to warn him to test the equipment. Although the trial court noted that Phillips had nothing to do with the high-voltage testing and no special testing equipment, the court reserved ruling on the motion, letting the case go to the jury. The judge commented, however, that he was "very, very much of the opinion that [he] should direct a verdict on what [he had] heard."

After the jury awarded a verdict of 20% contribution against Phillips, Phillips moved for judgment notwithstanding the verdict. The trial court agreed, after hearing argument, that Phillips had no duty to warn Conroy or to test the equipment before he cleaned the switchgear.

OPINION

■ The question of whether a party owes another a legal duty in a particular situation is one of law. (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 163, 456 N.E.2d 116.) Directed verdict or judgment *n.o.v.* is proper when the court concludes, based upon the record, that the defendant had no duty to the plaintiff. *E.g., Nowicki v. Union Starch & Refining Co.* (1973), 54 Ill. 2d 93, 296 N.E.2d 321; *Smith v. Bishop* (1965), 32 Ill. 2d 380, 205 N.E.2d 461 (passenger had no duty to warn driver of automobile).

■ Sherwin-Williams contends that Phillips exercised sufficient control over the work of Conroy to create a duty "to exercise reasonable care for the safety of Charles Conroy." Under negligence principles, an employer who entrusts work to an independent contractor owes a duty to exercise with reasonable care whatever control he retains or he faces liability for physical harm to "others." (Restatement (Second) of Torts §414 (1965).) According to Sherwin-Williams, since Phillips hired and supervised Conroy, it owed him this duty, the breach of which was a question for the jury.

Phillips views the issues somewhat differently. According to Phillips, the two, slightly narrower issues posed and ruled on were whether Phillips owed a duty to warn Conroy or a duty to test the electrical switchgear.

We find, after reviewing the record, that Phillips did not in fact owe Conroy a duty to warn him that the power might have been turned back on because Phillips had no way of knowing or suspecting that Rukavina and his assistant had reactivated the power to substation E3. We further find that Phillips did not owe Conroy a duty to test the switchgear because that was the very purpose for which Phillips hired Conroy in the first place. We therefore agree with the judgment of the trial court in setting aside the jury's verdict finding Phillips 20% liable for Conroy's injuries.

■ Sherwin-Williams nevertheless argues that Lubawy, Phillips' superintendent, was in charge of the work that Conroy performed. He was the one who told him where to test; Conroy reported to him concerning his test findings. Lubawy was also aware that Conroy was joining the other workers in cleaning the equipment on the morning of the incident. Based on these facts, Sherwin-Williams maintains that the issue of who was really in charge of the work was a jury question.

While retained control over work does create a duty to exercise that control with reasonable care, in this case the record reveals that it was Sherwin-Williams' personnel who actually directed the work overall. Lubawy received his instructions from Rukavina. Moreover, to

the extent Phillips retained or shared control with Sherwin-Williams over the high-voltage testing procedures, Conroy was not injured as a result of his testing of the equipment, the work he was retained to perform. He was injured while cleaning switchgear. The cleaning was done at Rukavina's behest. Rukavina directed Lubawy and Bonzani to clean the equipment, which they began to do in two of the cabinets. It was shortly thereafter that Conroy decided to help, without receiving orders or requests from Lubawy. We therefore conclude that there was no evidence sufficient to create a fact question as to whether Phillips retained control over the work Conroy was performing when he was injured. Nor does the record provide a basis for the argument that Phillips owed a duty to insure that the power was off, since it is undisputed that Conroy was hired to do the testing, that Phillips did not have the necessary equipment, and that in past jobs with Conroy, Phillips always relied on Conroy to do the high-voltage testing.

■ Sherwin-Williams' remaining contentions can be disposed of briefly. The assertion that Phillips created a duty by inducing Conroy's reliance on Phillips to test the equipment is unsupported by the evidence. Likewise, Sherwin-Williams' suggestion that Phillips had superior knowledge or expertise is belied by the undisputed fact that Conroy was the one with special training and experience in high-voltage testing. While Sherwin-Williams frames the expertise question in terms of cleaning electrical equipment (presumably arguing that Lubawy's more numerous years of experience gave him superior expertise in safety matters), we do not agree that somehow this general experience created superior expertise in the testing of high-voltage switchgear. Hence, Phillips did not assume a duty to test the switchgear before Conroy cleaned it.

■ Sherwin-Williams' final argument, apparently raised for the first time in the post-trial motion, is in two parts. First, since the work involved was inherently dangerous, Phillips owed a nondelegable duty to others to take special precautions for their protection. Second, the "others" to whom this nondelegable was owed includes Conroy.

We have no quarrel with the concept that the work Conroy was hired to do was inherently dangerous, a theory involving absolute liability rather than negligence. However, as Phillips points out, it is Sherwin-Williams which has the nondelegable duty, since the "contractee is responsible for injuries to the employees of the contractor or subcontractor *** where the work let to the contractor is inherently dangerous." (17 Ill. L. & Prac. *Employment* §274, at 627 (1956).) The sections of the Restatement (Second) of Torts that Sherwin-Williams cites to support its position concern the liability of employers of inde-

pendent contractors to *others* if the work performed results in injuries. (Restatement (Second) of Torts §§413, 416, 427 (1965).) Hence, if a third party was injured as a result of the inherently dangerous work that Conroy was performing, Phillips could be said to have a nondelegable duty to that third party. We need not speculate as to the application of these two sections, however, since no third party is involved.

The remaining question is whether the nondelegable duty extends to the employer of the independent contractor when it is the contractor himself who is injured as a result of the dangerous work. Sherwin-Williams concedes that there are no cases directly on point for this proposition but argues that it is a logical extension of the general rule. Certainly, there is sufficient authority to hold *Sherwin-Williams* liable under the nondelegable duty theory, as either the owner of the property or the "contractee" who ordered the work and whose own actions created the hazardous situation. (See *Woolen v. Aerojet General Corp.* 57 Cal. 2d 407, 410-11, 20 Cal. Rptr. 12, 15, 369 P.2d 708, 711 (fuel storage tank owner held liable for death of employee of independent contractor who was painting interior of tank when it exploded).) Sherwin-Williams was the contractee with the nondelegable duty. Assuming *arguendo* that there may be a set of facts in which a subcontractor (Phillips) may be liable for the injuries of its independent contractor (Conroy), those facts are absent from this record.

For the foregoing reasons, we affirm the judgment of the trial court in setting aside the jury verdict and entering judgment in favor of Phillips and against Sherwin-Williams.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.