JEROME M. FRIS, Plaintiff-Appellee, v. PERSONAL PRODUCTS COMPANY, Defendant-Appellant.

Third District   No. 3—93—0044

Opinion filed January 28, 1994.—Rehearing denied March 21, 1994.

Howard K. Priess II, of Tressler, Soderstrom, Maloney & Priess, of Chicago (Francis A. Spina, of counsel), for appellant.

Anesi, Ozmon & Rodin, Ltd., of Chicago (James J. Morici, Jr., of counsel), for appellee.

JUSTICE STOUDER delivered the opinion of the court:

The defendant, Personal Products Company, appeals from a judgment in favor of the plaintiff, Jerome Fris. We reverse.

Though this case involves a relatively simple incident, the record is extremely lengthy. The facts as testified to by the witnesses are often contradictory and less then clear. Given the nature of the numerous issues raised by Personal Products, we have thoroughly reviewed the record in this case.

In 1988, Personal Products was in the process of converting warehouse space at its Wilmington, Illinois, plant into a manufacturing facility. The project was known as the W & D warehouse conversion. "W" and "D" were the initials of the West German company, Winkler & Dubibeir, which manufactured the machinery which was being installed on the new assembly line. Acting as its own general contractor, Personal Products subcontracted out various aspects of the project. One of those contracts was with Stephen Construction Services, Inc. (Stephen), which was to do the HVAC work on the project. The plaintiff, Fris, was a sheet metal worker employed by Stephen.

In December 1988, Stephen entered into a contract with Sam J. Chellino Crane Rental, Inc., for crane services to lift certain large HVAC units onto the roof of Personal Products. On December 22, 1988, a large Chellino crane was placed on the west side of the building. Two of the crane's outriggers were resting on a grassy surface. Outriggers help to stabilize the crane. Because conditions were wet and relatively mild, the outriggers sank into the soft ground. Attempts to use the "cribbing" materials brought by Chellino proved inadequate, with the outriggers pushing these pieces of wood into the ground. Eventually wooden pallets taken from inside the Personal Products plant were used to crib or support the outriggers. The W & D machinery had been delivered on these pallets. Fris injured his right shoulder and arm when he and two other Stephen employees attempted to push one of these pallets.

Fris filed a two-count complaint against Personal Products and Chellino Crane. Stephen was brought in as a third-party defendant. Count I, premised on a Structural Work Act (Ill. Rev. Stat. 1991, ch. 48, par. 60 *et seq.*) claim, was dismissed prior to trial. The remaining count alleged various negligent acts on the part of Personal Products and Chellino Crane. During the jury trial, Chellino and Stephen settled with Fris, and the trial continued as to Personal Products' liability.

At trial, the plaintiff, Fris, testified he was a sheet metal worker employed by Stephen. On December 22, 1988, he was working at the Personal Products facility. On that day a Chellino crane had been brought in and placed on the west side of the building in order to lift four large HVAC units onto the roof. Fris testified that in trying to stabilize the crane, plywood "pads" had been placed under the outriggers. Because of the soft ground conditions, when the outriggers were lowered, the pads were pushed into the ground. Fris testified the crane operator from Chellino told him they were going to need more cribbing for the outriggers. Fris then told his foreman, Gary Granger,

what the operator had said. Fris testified that Personal Products' project engineer, Gary Younger, was standing next to Granger when he relayed this information to Granger.

Fris testified that Younger stated they might have some pallets in the plant which could be used. Fris and another man then tried to use some pieces of wood found near a dumpster, but that proved unsuccessful. Fris testified that Granger and Younger went into the plant. Fris testified he later went into the plant and encountered Younger near the door to the plant. No one else was present. Fris asked Younger where the pallet was he was talking about and Younger told him it was in the rail dock area.

In the northwest portion of the plant was an area in which railroad cars could be brought into the plant to load and unload materials. Fris went to this area and saw Granger and a fellow Stephen employee, Chester Reader. On the rail dock, the men found a large wooden pallet measuring approximately 10 feet by 5 feet, composed of 4 by 4s and 2 by 6s. A forklift truck was to be driven in on the railroad tracks. The pallet was going to have to be moved 15 or 20 feet to the edge of the dock and placed on the forks of the forklift.

Over defense counsel's objection, Fris testified Granger told him Personal Products had placed the pallet on the rail dock and that Granger had gotten permission to use the pallet. Fris testified they were going to try and push the pallet over to the edge of the dock. Over objection, Fris was allowed to testify that he asked Granger if he thought they might need more men to move the pallet. Fris testified that Granger said they should try to move it and that they had to get it outside. Then he, Reader and Granger bent down and tried to pick one end of the pallet up and push it toward the edge of the dock. Fris immediately "felt a loud pop" in his shoulder and let go of the pallet.

Thereafter, using pipes, the men were able to get the pallet onto the forklift truck. However, the forklift truck got stuck in the mud and the pallet had to be manually carried to the crane outriggers. A number of men, including the plaintiff, carried the pallet from the forklift truck to the crane and placed it under one of the outriggers.

Though Fris continued to have pain in his shoulder and arm, he continued working until sometime in mid-January. Thereafter, he underwent three operations and has not been able to return to work as a sheet metal worker.

Fris also testified that during the course of the project Gary Younger had on occasion stopped his work on the HVAC system, in order to make changes in the plans and specifications. For example, on one

occasion, Younger had told Fris he wanted a blast gate valve positioned in a certain direction.

On cross-examination, Fris was questioned extensively on his deposition testimony, which had been taken on two separate days some six months apart. In the deposition, Fris had stated that Granger told Younger they needed more cribbing, and that Granger and Younger walked toward the plant with Younger saying that they would see what they could find in the plant. According to Fris' deposition, Granger later came out of the plant and told him where the pallet was located.

In the deposition, Fris testified he went into the plant with Granger and Chester Reader. In the deposition he could not recall if Younger was near the door when they went into the plant. At one point he testified Younger was standing by the pallet. In the deposition he could not remember anything that Younger said when he saw him in the plant. In another part of the deposition, Fris could not remember where he saw Younger or if he was by the pallet. He testified that when Granger pointed out the pallet on the rail dock he did not know if Younger was present. He believed Granger probably chose the pallet because it was the biggest and heaviest. He stated he did not know how the pallet came to be on the rail dock. He testified in his deposition there was no conversation concerning how to get the pallet out to the crane. He testified he, Granger and Reader did not discuss alternative means of moving the pallet. At one point in his deposition, Fris testified five Stephen employees tried to push the pallet on the dock.

On further cross-examination, Fris testified he had on previous occasions moved pallets like this one in the Personal Products plant in order to get them out of the way.

Tim Hennessey testified he was the Personal Products engineering manager involved in the W & D warehouse conversion project. He testified he learned from project engineer, Gary Younger, that there was a problem with soft ground under the crane. Hennessey testified he and Younger discussed various alternatives on how to get the units on the roof. They decided to "explore" with personnel from Stephen and Chellino the option of "shoring" the outriggers. Hennessey testified he and Younger did not discuss the type of materials to be used or where the materials were to come from. There was no discussion of using wooden pallets from the W & D machines. On further questioning, Hennessey admitted that in his deposition he indicated Younger had said he would bring up the use of timbers with the contractors and that Younger was aware of the presence of shipping pallets.

However, he could not recall discussing use of the pallets for this purpose.

Subsequently, Hennessey learned from Younger that pallets had been used and that they were carried manually. On cross-examination, Hennessey stated he could not remember the specifics of his conversations with Younger on this subject. Younger never told him he directed anyone to use the pallets, or that Younger saw the pallets before they were placed under the outriggers.

Gary Younger testified that in December of 1988 he was employed by Personal Products and acted as senior engineer on the W & D warehouse conversion project. Younger testified he recalled speaking to Tim Hennessey about the problem of soft ground under the crane's outriggers; however, he could not recall discussing the use of pallets with Hennessey. Younger testified he did not discuss the use of pallets with anyone from Stephen. He stated he did not know that pallets had been used to crib the crane until he saw them under the outriggers. Younger testified that in theory, use of the pallets was by permission only; however, in practice, the rules were not rigidly enforced.

Younger testified that under the contract, the contractors were responsible for their own means, methods and techniques of completing their work. Stephen was responsible for seeing that the crane was properly stabilized. On cross-examination, Younger conceded that Personal Products retained the authority to stop any work which was not being conducted in a safe manner.

Gary Granger testified he was the foreman from Stephen on the W & D warehouse conversion project and Fris' boss. Granger testified he could not recall Gary Younger being outside near the crane when the problem arose with the crane's outriggers. Granger did recall Younger being out there at some point during the problem. Granger could not recall any conversations with Younger concerning additional cribbing materials.

Subsequently, Granger went into the building and saw the pallet on the rail dock. He did not know how it got there. Granger could not recall any conversations with Reader and Fris while they were near the pallet just before they tried to move it. Granger testified he could not recall Fris asking if more men were needed to move the pallet. Granger further testified he had asked someone from Personal Products for permission to use the pallet, although he could not recall who he asked.

Granger stated that Fris was hurt when they tried to push the pallet. They made no attempt to lift the pallet. Granger testified that pushing heavy objects would be a customary and normal practice for a

sheet metal worker. On redirect, Granger conceded that if someone from Personal Products had told him to move the pallet in another way he would have followed their advice.

Chester Reader, a sheet metal worker from Stephen, testified he took part in the effort to crib the crane's outriggers. Reader testified he was present when a conversation concerning the problem with the crane was discussed. According to Reader, this conversation took place inside the plant because it was raining outside. He testified that Gary Younger was involved in the conversation. Reader overheard three options being discussed—cribbing the outriggers, putting off the lift until the ground froze, or using a helicopter to place the HVAC units on the roof. However, he was directed to another job during this conversation and did not hear what further was discussed.

Subsequently, Granger asked for his assistance and took him to the rail dock area. Over a hearsay objection, Reader testified that Granger told him that someone from Personal Products had given permission to use the pallet under the outriggers. However, later during cross-examination Reader testified he did not know if someone from Stephen had asked to use the pallet. Reader testified that he, Fris and Granger tried to move the pallet within a minute or two of arriving in the rail dock area. When they tried to move the pallet, he noticed Fris flinching. Reader testified that following the incident, he did not observe Fris working in a different manner during the rest of the day.

The jury returned a verdict in favor of Fris in the amount of $693,437.50. The trial court denied Personal Products' various post-trial motions including its motion for judgment *n.o.v.*

On appeal, Personal Products contends the trial court erred in denying its motion for judgment *n.o.v.*, because viewing the "admissible" evidence in a light most favorable to Fris reveals that no verdict in favor of Fris could ever stand. Personal Products argues Fris failed to present evidence showing a duty on the part of Personal Products, a breach of that alleged duty or that the alleged breach was a proximate cause of Fris' injury.

A judgment *n.o.v.* is properly entered in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d. 494, 229 N.E.2d 504.) In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence, and any inferences therefrom, in the light

most favorable to the nonmovant. *Maple v. Gustafson* (1992), 151 Ill. 2d 445, 603 N.E.2d 508.

In an action for negligence the plaintiff must set out sufficient facts to establish that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused injury to the plaintiff. (*Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 592 N.E.2d 1098.) The existence of a duty of care must be determined by the court as a matter of law and absent a showing from which the court can infer the existence of a duty no recovery by the plaintiff is possible as a matter of law. (*Schoenbeck v. Du Page Water Comm'n* (1993), 240 Ill. App. 3d 1045, 607 N.E.2d 693.) A judgment *n.o.v.* is proper when the court concludes, based upon the record, that the defendant had no duty to the plaintiff. *Conroy v. Sherwin-Williams Co.* (1988), 168 Ill. App. 3d 333, 522 N.E.2d 731.

In the instant case, Fris was the employee of Stephen Construction Services, Inc. Stephen had a contract with Personal Products to, among other things, install certain HVAC systems at the Personal Products facility. In other words, Fris was an employee of an independent contractor. As a general rule, an employer of an independent contractor is not liable for the acts or omissions of the latter. *Gomien v. Wear-Ever Aluminum, Inc.* (1971), 50 Ill. 2d 19, 276 N.E.2d 336.

Fris' negligence claim was based on section 414 of the Restatement (Second) of Torts, which provides: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Restatement (Second) of Torts §414 (1965).) Expounding on this rule, comment *c* to section 414 states: "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts §414, Comment *c*, at 388 (1965).

■ Applying section 414, the courts of this State have now recognized that an employee hired by an independent contractor to do construction work may obtain recovery for injuries sustained in the course of that work from the owner of the premises where the owner has retained the requisite control over the work and has failed to exercise that control properly. See *Haberer v. Village of Sauget* (1987), 158 Ill. App. 3d 313, 511 N.E.2d 805.

The evidence shows that under its contract with Stephen, Personal Products retained the right to inspect the work done and order changes to the specifications and plans. Personal Products also retained the right to make sure safety precautions were observed, and that the work was done in a safe manner. However, the evidence does not show that Personal Products retained any control over the incidental aspects of Stephen's work. Stephen was free to move, weld, lift and place objects as it saw fit in order to meet the specifications and plans established by Personal Products. In other words, Personal Products controlled the ends; Stephen was responsible for the means by which those ends were to be achieved.

In this case, Stephen agreed to install four large HVAC units on the roof of Personal Products. Stephen hired Chellino Crane to lift the units onto the roof. Because the outriggers of the crane were sinking into the soft ground, they had to be "shored up" by placing wooden timbers under them. It was determined that the pallets on which the W & D machinery had been delivered to the plant would be useful for this purpose. After a pallet was located on the rail dock, three Stephen employees, including the plaintiff, Fris, attempted to manually push the pallet over to the edge of the rail dock where a forklift truck could take the pallet out to the crane.

There was no evidence of an unsafe condition surrounding this pallet. The rail dock area was well-lit and its surface was composed of relatively smooth, hard concrete. Fris testified he had moved pallets like this one and other objects in the course of his duties as a sheet metal worker. The evidence shows nothing inherently unsafe about this routine and incidental activity. As a sheet metal worker he did this type of activity on a daily basis.

■ Although Personal Products retained the right to require that work be done in a safe manner, this general authority cannot be viewed as creating such a right of supervision as to have prevented Stephen from doing routine work in its own way. Personal Products' authority under the contract was not so broad. It did not control the routine and incidental aspects of Stephen's work. Personal Products did not retain control of Stephen's activities to the extent that it had

a duty to Fris under these circumstances. Adoption of Fris' theory of liability would in effect result in strict liability for all injuries to employees of independent contractors.

In sum, there was no evidence that as a matter of law there was a duty on the part of Personal Products toward Fris in this incident involving a routine and incidental aspect of his job. Therefore, the trial court erred in denying Personal Products' motion for a judgment *n.o.v.*

Because we reverse the trial court's denial of judgment *n.o.v.*, we need not address the overwhelming number of alleged trial errors raised by Personal Products as the basis for its request for a new trial before a different trial judge.

For the foregoing reasons, the judgment of the circuit court of Will County is reversed and the cause remanded with directions that the trial court enter a judgment *n.o.v.* in favor of the defendant, Personal Products.

Reversed and remanded with directions.

SLATER, P.J., and McCUSKEY, J., concur.