NEAL & COMPANY, INC., an Alaska
corporation, Appellant,

v.

CITY OF DILLINGHAM and CH2M
Hill Northwest, Inc., Appellees.

No. S–6525.

Supreme Court of Alaska.

Aug. 30, 1996.

R.R. De Young, Wade & De Young, Anchorage, for Appellant.

R. Eldridge Hicks and Jeffrey S. Moeller, Hicks, Boyd, Chandler & Falconer, Anchorage, for Appellee City of Dillingham.

D.K. "Kirby" Wright, Jr., Hintze & Wright, Anchorage, for Appellee CH2M Hill Northwest, Inc.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION

This appeal centers on the application of the notice requirement of the Differing Site Conditions clause found in a contract between appellant Neal & Company, Inc. (NCI) and appellee City of Dillingham (City). Appellee CH2M Hill (Hill), the City's engineer on the project, is involved in this appeal primarily because it acted as the City's representative on the project.

NCI claims that it encountered difficulties in excavation during the project because of unexpected soil conditions, that it gave notice of these unexpected conditions to Hill (and thus constructively to the City), and that therefore it is entitled to assert a claim under the Differing Site Conditions clause. The City and Hill claim that no notice of a differing site condition was given. The superior court ruled on partial summary judgment that NCI did not give adequate notice of a differing site condition.

NCI also appeals the superior court's denial of its motions for leave to amend its complaint, for continuance of the trial, and for disqualification of the trial judge.

### II. FACTS

In February 1987 the City solicited bids for the construction of a sewerage facility. The project included two lagoon ponds. The lagoons were to be dug into a bluff outside of Dillingham. Interested bidders received a set of drawings and a volume containing bidding requirements, contract forms, conditions of the contract, and construction specifications, along with a "Geotechnical Data Summary." The geological survey and the data summary, as well as all technical specifications for the project, were completed by Hill, the City's engineer and on-site representative for the project.

The first dig in the construction of the lagoons was to be a wedge-cut into the bluff from the surface down to an elevation of forty-seven feet. After the first dig down to the forty-seven foot level, the second dig would begin, consisting of the excavation of two ponds down from the flat area created

by the first dig. The pools were to be eighteen feet deep, reaching an elevation of twenty-nine feet at their lowest point.

The data summary stated that there was a layer of peat containing some silt infilling extending four feet to eight feet below the original ground surface. Below the peat was a layer of sand and silty sand interbedded with layers of silt extending about six to twelve feet below the peat zone. Below that, the data summary described the remaining depth of the excavation as "fairly uniform to the remaining depth of the borings, showing a layer of stiff-to-hard clay having low-to-medium plasticity." Regarding the clay layer, the data summary specified: "Occasional samples contained clay with gravel and sand suspended in the clay matrix, indicating that the clay unit may be a glacial till. No distinct bedding or layers of coarse grained material were found in the clay unit." The data summary went on to describe the process by which the lagoons could be constructed:

> The most attractive aspect of constructing the lagoons in the lower clay zone of the bluff is that they will not have to be lined. Also, native materials will not have to be recompacted to form the dikes, as the dikes can be constructed by carving the lagoons out of the bluff and leaving the clay intact around them. Construction concerns for this configuration are primarily slope protection against seepage and removal and disposal of the excavated material.

A set of contract documents was sent to NCI. On April 1, 1987, bids were opened and NCI was declared the low bidder at $2,059,-991. NCI began the excavation on June 6, 1987. Excavation of the first dig, down to the forty-seven foot elevation of the pond surface, was completed. Work was suspended in October 1987. The second dig, excavation of the pond prisms, began when the ground froze. Excavation was completed by April 20, 1988.

During the summer of 1987, while excavating the first dig, NCI encountered water bubbling through sand lenses in the excavation. Randy Mattoon, NCI's project superintendent, discussed with Tony Neal, president of NCI, the possibility of the existence of sand lenses impairing the integrity of the lagoon, which would allow sewage to escape. Mattoon also discussed the issue of water permeable sand lenses with Bob Richie, Hill's representative. Ken Green, a Hill geotechnical engineer, was scheduled to visit the project the week of July 27, 1987.

NCI contends that Green's visit was scheduled after and because of the Mattoon–Richie conversation regarding the sand lenses. The City and Hill contend that Green's visit had already been scheduled.

During Green's visit, a test pit was dug in each of the pond prisms, and a soil sample was taken from one of the pits. Green's field notes, taken at the time the pits were dug, indicate that at the level where the lagoons were to be dug, he saw "clayey *silt* Slightly plastic Blue Gray Moist slightly Blocky structure. stiff to n. stiff[.]" This level (two to nineteen feet down from the forty-seven foot elevation of the surface of the lagoon) had been described in the Data Summary as "a layer of stiff-to-hard clay having low-to-medium plasticity."

During this time, the consistency of the soil was causing difficulties in NCI's excavation. The soil in the lagoon area turned into a sticky mud, creating problems with excavation and transportation. The consistency of the soil, and the difficulty of excavating it, form the basis of NCI's Differing Site Condition claim.

During the 1988 phase of the excavation, water infiltration continued to cause problems. In October 1988, NCI advised Hill that it was considering legal action. NCI then filed suit.

## III. *SUPERIOR COURT PROCEEDINGS*

During the course of these proceedings, numerous claims and cross-claims were filed. The following are relevant to this appeal.

On March 29, 1990, NCI filed a second amended complaint, which added NCI's Differing Site Condition claim to the lawsuit as the sixth cause of action, and added what NCI interprets as a defective specifications claim as the seventh cause of action. In May, NCI filed a substitute second amended

complaint. Judge Beverly Cutler granted the motion to amend on August 6, 1990. In January 1991, the City, seeking indemnity from NCI's claims, filed a third-party complaint against Hill.

In November 1991, Hill filed a motion for partial summary judgment based on the limitation of liability and indemnity clause in its contract with the City. The superior court ruled for Hill. The City filed a petition for review, which this court accepted and has since decided in *City of Dillingham v. CH2M Hill Northwest, Inc.*, 873 P.2d 1271 (Alaska 1994).

In April 1993, NCI moved for partial summary judgment, seeking to establish the sufficiency of its notice of differing site conditions. The City moved for summary judgment against both NCI and Hill. In October 1993 the superior court granted partial summary judgment to the City and dismissed NCI's sixth and seventh causes of action. The court subsequently denied NCI's motion for reconsideration.

Meanwhile, in November 1993, NCI filed a motion for leave to amend its complaint and a motion to continue the trial. The superior court denied these motions. The superior court also denied NCI's motion to reconsider the denial of its motion to amend.

On January 26, 1994, NCI filed a motion to disqualify the judge. The next day, Judge Cutler refused to recuse herself, and referred the motion to the presiding judge for assignment. The motion was assigned to Judge Peter A. Michalski, who denied the motion for disqualification on January 31.

▪▪▪▪ On February 3, 1994, the parties reached a settlement, reserving to NCI the right to appeal the rulings which are now before us: the dismissal of NCI's sixth and seventh causes of action, the denial of NCI's motions for leave to file a third amended complaint and for continuance of the trial,

and the denial of the motion to disqualify Judge Cutler.

## IV. DISCUSSION

### A. The Summary Judgment Dismissing NCI's Sixth and Seventh Causes of Action [1]

▪▪▪▪ Resolution of this summary judgment turns on the interpretation and application of the Differing Site Conditions clause which, at the time the contract for this project was made, was required by the Environmental Protection Agency in contracts for projects with EPA funding. 40 C.F.R. § 33.1030 (1986). NCI filed a motion seeking to establish that oral communications with Hill constituted actual notice sufficient to meet the notice requirements in the Differing Site Condition contract clause. Paragraph 4(a) of the contract requires that the notice be in writing. Though there is no claim that NCI provided timely written notice of any differing site condition, case law establishes that under certain circumstances timely actual notice, even in the absence of written notice, will be considered sufficient notice under the clause. See, e.g., *Brechan Enter. v. United States,* 12 Cl.Ct. 545 (1987) ("[N]otice does not need to be in any specific format; it need only show the existence of the condition.").

Therefore, the appeal of this summary judgment requires an interpretation of what qualifies as the minimum necessary notice under the clause, and, secondly, of whether the acts alleged here satisfy that minimum.

In *Brinderson Corp. v. Hampton Rds. San. Dist.*, 825 F.2d 41 (4th Cir.1987), a contractor had problems with wet soil conditions which forced it to incur increased costs. The court stated that "[g]enerally, when the owner has actual or constructive notice of the conditions underlying the claim and an opportunity to investigate, that is sufficient." *Id.* at 44. Similarly, NCI's notice to the City, though not in writing, will be considered

---

1. In reviewing a grant of summary judgment, we "must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law." *Saddler v. Alaska Marine Lines*, 856 P.2d 784, 787 (Alaska 1993). All reasonable factual inferences must be drawn in favor of the non-moving party.

*Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). When reviewing a trial court's interpretation of contract language, based solely on documentary evidence, this court will use its independent judgment. *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991).

sufficient if it was clear and it alerted or should have alerted the City to the fact that NCI believed it had encountered differing site conditions.

■ NCI claims that Green, and therefore Hill, was put on notice when Green met with NCI representatives to talk about problems with the composition of the soil and then actually took a soil sample and noted that its composition differed from what the data summary predicted. If Green knew upon looking at the soil that the site condition was materially different from what was expected, he was on notice even if the contractor continued to labor ignorantly, having no idea why work was progressing so slowly.[2]

■ NCI's position is that after concerns about sand lenses were expressed to Richie, Green was specially brought in to test the soil. When he looked at the pits he saw "clayey *silt*," not clay, at the elevation of the lagoon prisms (*i.e.*, between elevations forty-seven and twenty-nine). NCI asserts that the clayey silt constituted a differing site condition,[3] and that Green knew that it was.

But NCI's assertions and suppositions are not supported by reasonable inferences from the evidence. When Green came to inspect the soil—even if he came in especially because of NCI's concerns—the reason for his visit was possible sand lenses in the floor of the lagoon, not the consistency of the material to be excavated. The notes he took were simply a recording of what he saw at various levels, not the focus of his investigation.

Because of the concerns about sand lenses, Green came to the site and took a soil sample in the presence of representatives of NCI and Hill. The sample came from the twenty-seven foot elevation, which was two feet below the level anticipated for the lagoon floors. This again indicates that the concerns Richie and Green were addressing related to the eventual integrity of the lagoon floor, not to the difficulty of excavation. Green's log

notes describing the composition of the soil on the way down the test pits were offhand assessments, not the focus of his attention.

NCI asserts that Mattoon's characterization of the material within the lagoon prism as blue clay, and the level the sample was taken, are both evidence that Green knew about the differing site condition and attempted to mislead NCI into believing there was none.

NCI speculates that Green, knowing that the presence of clayey silt was a differing site condition, lied to Mattoon to cover up the problem, telling him that they were looking at blue clay. But there is no evidence in the record that Green told Mattoon that the soil was blue clay, except for Mattoon's note indicating that they had found blue clay. Mattoon's note nowhere states that he received this classification from Green.

NCI also suggests that Green "used his superior knowledge to select a single sample that aided in the deception." Because the sample was taken from test pit 1, and not pit 2, and because it was taken from below the lagoon floor, NCI concludes that Green was taking the sample from a place he knew would be clay. But NCI's June–July 1987 concern regarding the soil composition, which Mattoon had expressed to Richie, was the integrity of the pond floors, not the difficulty of excavation. None of NCI's representatives found it remarkable at the time that Green took a sample from below the bottom of the lagoon. The only reasonable conclusion is that, since seepage in the lagoon floor was the concern, Green took a sample from the material which would eventually form the floor of the lagoon in order to test its characteristics.

■ NCI's interpretation of the evidence is untenable. It relies entirely on conjecture to convert concerns expressed about the integrity of the pond floors into notice of unexpected conditions within the

2. The *Brinderson* court held that the resident engineers "were on the site, and aware of the problems, and they had abundant opportunity to inspect and investigate. This satisfied the notice requirement." *Brinderson*, 825 F.2d at 45.

3. "A DSC exists if the actual conditions of the site differ materially from what ... a contractor would have expected based on indications in the contract." *Municipality of Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 323 (Alaska 1992).

pond prisms. There is no reasonable interpretation of the facts which supports NCI's contention that it gave clear non-written notice of a differing site condition.[4] The superior court correctly dismissed NCI's sixth and seventh causes of action.[5]

4. The superior court entered the following relevant findings of fact regarding the differing site condition issue:

Here the court finds that, under the case law cited by Neal & Co., in order for oral notice to be sufficient to replace the written notice specifically called for in the contract, either the oral notice must have given actual notice of differing site conditions to CH2M Hill and/or the City, or the oral notice must be oral notice that would have given notice of differing site conditions to CH2M Hill and/or the City except for conditions beyond Neal & Co.'s control. The court notes that in this case there is a genuine dispute regarding to whom notice of a differing site condition must be given. Given the court's holding discussed below that Neal & Co. did not give adequate notice to CH2M Hill, the court does not reach this latter issue.

The court finds that Neal & Co. failed to give oral notice of differing soil conditions in the lagoon excavation, sufficiently forceful to anyone to replace the contractual requirement of clear written notice. This holding is based on the fact that Neal & Co. merely suggested, once, that there *might* be a differing soil condition, and when this suggestion was rejected by CH2M Hill, Neal & Co. dropped the subject. There was no appeal to higher authority of this rejection by Neal & Co., or specific or repeated oral notice given, as occurred in *W.C. Shepherd [v. United States*, 125 Ct.Cl. 724, 113 F.Supp. 648 (1953)] and *Brinderson.*

The court also finds nothing in the record indicating that CH2M Hill had any actual knowledge of differing conditions. There were no Field or Change Orders requested by any party, or issued because of the alleged sand lenses. Neal & Co. has not submitted any evidence tending to show that any CH2M Hill employee observed a changed condition. The record does indicate that CH2M Hill examined the site once for sand lenses, and did not find any. The court holds that the mere fact that CH2M Hill conducted such examination is not evidence that CH2M Hill had actual knowledge of a differing condition.

The court finds that, at best, Neal & Co. gave a tentative and equivocal notice that there may have been a differing site condition at the lagoon site, and holds that this notice was not sufficient to replace the written notice requirement of E.P.A. Contract Clause 4(a), or to support a claim for equitable adjustment of the contract price under 4(c). *See, Blankenship Const[r]. Co. v. N.C. State Highway Comm'n*, 28 N.C.App. 593, 222 S.E.2d 452, 461 (1976). . . . .

## B. *Denial of NCI's Motions to Amend Complaint and for Continuance of Trial* [6]

■ In November of 1993, NCI sought to amend its complaint. It reworded its seventh cause of action to indicate that it was

Based on the discussion above, the court finds that there is no material fact dispute regarding Neal & Co.'s purported notice to CH2M Hill, and based on the facts noted, the court holds as a matter of law that the City is entitled to summary judgment that Neal & Co.'s differing site condition claim is barred for lack of adequate notice as required by E.P.A. Contract Clause 4(c) and Contract General Condition 58. Neal & Co.'s differing site condition claim against the City of Dillingham is hereby dismissed from this case.

In denying NCI's motion for reconsideration, the superior court stated in part:

If Neal in fact encountered a differing site condition for which contract adjustment and written notice were required, Neal as the contractor on a large public works project, engaged in the actual earthwork that was the primary focus of the project and doing the actual encountering of differing conditions, if such were truly encountered, had the responsibility to give written notice or other compelling notice.

5. The superior court read NCI's seventh cause of action as a restatement of the sixth cause of action, which was explicitly a Differing Site Condition claim. NCI maintains that the seventh cause of action was a defective specifications claim, not a Differing Site Condition claim. It is unnecessary to determine whether NCI is correct in this assertion, as a defective specifications claim under the circumstances of the case at bar would fall to the same deficiency of notice which defeats the Differing Site Condition claim.

NCI contends that the notice requirement does not apply to defective specifications claims. For this proposition, NCI cites Paragraph 3(a)(4) of the standard EPA specifications. But Paragraph 3 deals with compensation for change orders issued by the City or Hill, whereas Paragraph 4 addresses equitable adjustments due to site conditions differing materially from those contemplated in the contract. *Compare* 40 C.F.R. § 33.1030 ¶ 3 *with* 40 C.F.R. § 33.1030 ¶ 4. Regardless of whether NCI's seventh cause of action states a different claim from its sixth cause of action, both are subject to the notice requirement of Paragraph 4.

6. We apply an abuse of discretion standard in reviewing a trial court's denial of a motion for leave to amend. *James v. State*, 815 P.2d 352, 359 (Alaska 1991). A denial of a motion for continuance is also reviewed under an abuse of discretion standard. *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989).

intended to state a defective specifications claim rather than simply repeat the sixth cause of action's claim of differing site conditions. Also, NCI attempted for the first time to assert four separate claims directly against Hill. To this point, NCI had made all of its claims against the City, which then sought indemnity from Hill; there had been no direct NCI claims against Hill. Finally, NCI sought a continuance. The superior court denied all of these motions.

NCI argues that the superior court's denial of leave to amend was based on a failure to apply Civil Rule 15(a), which provides that "leave shall be freely given when justice so requires." The superior court stated that it

> finds no manifest injustice in denying Neal leave to amend its complaint at this late date. Therefore the court finds that justice does not require amendment. Neal has had ample opportunity to pursue in a timely fashion all of the claims listed in the proposed Third Amended Complaint.... [T]here is no manifest injustice in failing to permit amendment on the eve of trial, after five years of preparation and motions.

NCI claims that the superior court's application of the "manifest injustice" standard was an error.

The superior court indicated in its order denying Neal's motion to amend his complaint that its reason for applying the "manifest injustice" standard was Civil Rule 16(e). While Civil Rule 15(a) directs that leave be "freely granted" by the court "when justice so requires," Civil Rule 16(e) states that pretrial orders following a final pretrial conference shall control unless modified by the judge "to prevent manifest injustice."

NCI argues that the superior court was mistaken in its belief that a Civil Rule 16(e) pretrial order had been issued, and, therefore, that the superior court's application of Civil Rule 16(e) instead of Civil Rule 15 was an error. However, it is unnecessary to determine whether the superior court had issued a Civil Rule 16(e) pretrial order. If there was no Civil Rule 16(e) pretrial order, and the superior court therefore erred in applying the "manifest injustice" standard, that error was harmless. Even under the "freely given when justice so requires" standard, it is difficult to see why NCI should be allowed to amend its complaint again. After five years of litigation, including two amendments to its complaints, and after losing a major summary judgment motion, NCI requested leave to rework its causes of action and to bring four claims against Hill for the first time. Justice does not require that such leave be granted.

The superior court carefully and accurately analyzed the amendments which NCI was offering to its complaint. All of its findings would sustain a denial of leave to amend under either the Rule 15(a) or the Rule 16(e) standard.

 Similarly, it was not an abuse of discretion for the superior court, at that late point in the litigation, to deny a continuance to NCI.

### C. *Denial of NCI's Motion for Disqualification* [7]

 During a conference involving Tony Neal, President of NCI, NCI's counsel, and Hicks and Moeller, counsel for the City, Hicks told Neal about some contact he had with Judge Cutler. Judge Cutler had worked for Hicks approximately twenty years earlier, and they had occasional social contact since. There are some minor disputes as to some details.

However, there is no record support for NCI's assertion of bias or lack of impartiality. In short, there is no merit in NCI's claim that Judge Cutler should have been disqualified.

Judge Cutler and Judge Michalski did not err in denying the motion to disqualify.

---

7. A trial court's decision not to recuse itself is reviewable on an abuse of discretion standard, as is a decision by a reviewing judge not to disqualify the trial judge. *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979). The refusal to recuse the trial judge will be reversed only when it is evident that no fair-minded person could have come to the same conclusion on the basis of the known facts. *Alaska Trams Corp. v. Alaska Elec. Light & Power*, 743 P.2d 350, 353 (Alaska 1987); *Amidon*, 604 P.2d at 577.

## V. CONCLUSION

Review of the record shows that the superior court correctly granted summary judgment against NCI on its Differing Site Conditions claim. NCI's other points on appeal, regarding the motions to amend, to continue the trial, and to recuse the trial judge, are also without merit. The rulings of the superior court and of Judge Michalski are AFFIRMED in all respects.

MOORE, C.J., not participating.