STATE of Alaska, DEPARTMENT OF
TRANSPORTATION AND PUBLIC
FACILITIES, Appellant,

v.

Lance MILLER and Velda Miller, for themselves and on behalf of Miranda Miller and Lance Miller, Jr., minors, and Annmarie Miller, Appellees.

No. S–11946.

Supreme Court of Alaska.

Oct. 6, 2006.

---

522

David H. Knapp, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellant.

Jim J. Valcarce, Cooke, Roosa & Valcarce, LLC, Bethel, and William S. Cummings, Ashburn & Mason, P.C., Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I.  INTRODUCTION

In January 2001 Lance Miller was injured in a plane crash while attempting to land at an unattended airport in Kipnuk. He brought an action against the State of Alaska, alleging that its failure to warn him that neither of the airport's windsocks was functioning constituted negligence and seeking damages on behalf of himself, his wife, and his three children for his injuries, lost earning capacity, and loss of consortium. A jury awarded Miller $1,256,000 and awarded his wife $20,000. The State appeals this judgment on four grounds. First, it claims that the superior court erred in denying the State a continuance when information potentially affecting Miller's credibility and the measure

of damages came to light two and a half months before trial. Second, it alleges that the court erred in its jury instructions on negligence. Third, the State claims that the court erred in permitting the jury to consider Miller's lost earning capacity. Finally, the State argues that the superior court erred by failing to grant the motion for judgment notwithstanding the verdict (JNOV). Because we conclude that the superior court did not err in its rulings on these issues, we affirm the judgment.

## II.  FACTS AND PROCEEDINGS

### A.  Kipnuk Airport

The accident at issue here occurred at a State-owned airport in the Native Village of Kipnuk. The airport is open to the public, including student pilots, and when it was built in 1981, the State installed a windsock at each end of the 2,160–foot–long runway.[1] The State aviation director testified that it was "important" to have windsocks at each end because "you can easily have a different wind condition 2,000 feet away ... [and][t]he windsock will indicate what the wind direction and ... velocity is only in the proximity right adjacent to the windsock. Anything that's hundreds of feet away ... could be different."

The pole supporting the south windsock was broken in a snowmobile accident "a few years" before the 2004 trial in this case. The State issued a Notice to Airmen (NOTAM) in November 2000, stating that the south windsock was "damaged [and] not functioning properly," but not providing any further details. By 2001 the sock was still "stuck in the mud[,] ... torn and in disrepair."

Although the north windsock had not fallen over, rust at the base of the pole caused it to lean to one side. In addition, the bearings that allowed the north sock to rotate (indicating the direction of the wind) were worn out, and part of the sock itself was missing. Paul Kiunya, an Alaska Department of Transpor-

---

1.  A windsock is a flexible cloth cone, the opening of which is attached to a wire frame at the end of a vertical pole. By looking at the direction the sock is pointing, and the amount of air collected in it, pilots can gauge the direction and speed of the wind. An aviation expert with extensive flying experience in rural Alaska testified that every airport he had ever flown into, including those in "third world countries" had a windsock. He compared the danger of a malfunctioning windsock to the risk of a car accident at an intersection with a malfunctioning traffic light.

tation and Public Facilities (DOTPF) worker in Kipnuk, testified that he used wooden boards to prop the sock up but that the boards would rot quickly. He maintained that he "always report[ed] everything" he knew about the sock's condition to his superiors. According to a Kipnuk resident who could see the sock from his home, the sock did not accurately indicate the direction of the wind. The State's NOTAM did not mention the north windsock.

### B. The Accident

On January 23, 2001, Miller flew his Cessna 172 from Bethel to Kipnuk to perform maintenance work for his employer, the Federal Aviation Administration (FAA). His only passenger, Stan Hoffman, was a co-worker. The trip had been delayed for at least two days due to a snowstorm at Kipnuk. Although Miller had flown to this airport several times before, he had just recently received his pilot's license, and was prepared to turn back if the wind was powerful enough to make landing dangerous. Relying on the north windsock, which was "just l[y]ing limp[,] ... not indicating a very strong wind," he decided to land.

Miller felt a strong crosswind as he was landing, but corrected for it by "crabbing" the plane to keep the wings level. Although the plane touched down where he intended, the wind blew it to the left as soon as it made contact with the runway. Miller was "shocked at the strength of the wind that was pushing [the plane] off" the runway, and attempted to compensate for it. When this attempt failed, Miller decided to abort the landing, and brought the plane to full throttle to take off again. But the plane continued to veer to the left and, when it rolled off the runway, it flipped over.

Miller's shoulder harness was still buckled, suspending him in an upside-down seated position. He had to use both hands to unbuckle it, and when he did so, he landed on his head and "wrenched" his neck. After opening the door and crawling out, he helped his uninjured passenger extricate himself. He then walked over to the north windsock:

> I ... look[ed] at that windsock and I was dismayed at [its] condition.... I mean ... that pole that was being bent. That's what I[saw]. I walked over ... and the windsock [was] sitting there froze[n] up.... I mean, I was just shocked at the condition.

Miller took a commercial flight back to Bethel and immediately went to the emergency room.

### C. Miller's Injuries

At the emergency room, Miller "complain[ed] of neck pain, some light-headedness and [a] headache with a little bit of nausea." The doctor diagnosed cervical neck strain, lower back strain, and a concussion. Six days later, Miller saw Dr. Shannon Radke, a physician who had treated him several times before the accident.[2] Radke testified that Miller complained of worsening pain in his neck and lower back and that she prescribed pain medication.

Although Miller returned to work in March 2001, performing "light dut[ies]" that did not involve flying or lifting, he continued to experience back pain. His economic expert, Francis Gallela, testified that Miller was kept on the payroll without being given significant duties: "He got transferred to Anchorage, they put him at a job, he had nothing to do here. He would sit [at] his desk with nothing to do." According to Gallela, "that wore pretty heavily on him ... [a]nd it became clear to [Miller] that [the] FAA did not want him there since he couldn't do his job." A

---

**2.** Miller had consulted Radke about back pain before the accident. In April 2000 he had experienced back pain related to the treatment of a bout of meningitis, and in July of the same year, he was diagnosed with a protruding disc. Although he reported decreased sensation in his right leg in July 2000, his pain had decreased since April 2000. In October 2000 he reported to the emergency room, complaining of "sharp chest pains," but "his back was noted to be nontender on that visit, and he also didn't complain

of any back pain." Dr. Radke testified that the medical record from October "would lead [her] to believe that [Miller's] previous disc herniations and any other back injuries that he had had were resolved at that time." She stated that the injuries Miller complained of in January 2001 were likely caused by the plane accident because "prior to the plane crash[,] he had not had any complaints of back pain for quite some time, and since ... the plane crash he has had pain ever since."

December 2002 medical evaluation, which measured his ability to engage in "physical activities [such as] ... lifting, carrying, walking, standing [and] different activities involving reaching," found that Miller did not qualify for a maintenance mechanic position with the FAA. At that time, Miller was still taking pain medication.

In January 2003 he saw Dr. Larry Levine, a physical rehabilitation specialist. Dr. Levine performed several procedures, including a surgical procedure called provocative discography,[3] to identify the source of Miller's back pain, and diagnosed him with a spinal disc herniation. He testified that Miller might need "further intervention" in the future, including a possible disc replacement. Although Dr. Levine imposed restrictions on Miller's physical activities at work, he maintained that, by September 2003, Miller was capable of working in "either sedentary or light positions."

In May 2004 Miller testified that his back "hurt[ ] all the time, and [that] at times, it feels like [a] knife is getting twisted" in his back. He also claimed to suffer depression and to have contemplated suicide because of the effects of his injuries. In addition to adversely affecting his relationship with his son, Miller maintained that his pain had caused him to become dependent on medication:

> This is what my life has come to, bottles of Oxycontin, Oxycodone, Neurocontin, just endless bottles of pills. I don't want to take this stuff, but this is what my life has come to so I can get up, get out of my house and try to do something as best I can.... There's Prozac there so I don't kill myself. Here's Oxycontin, more Oxycontin. I mean, this is all narcotics. This is what my life has come to.

A neurologist who testified for Miller stated that Miller had been depressed since the time of the accident and had also suffered dizziness, blurred vision, and sexual difficulties. He attributed these ailments to the head trauma Miller experienced during the accident.

The State's experts, however, found that Miller's injuries from the accident consisted "primarily [of] ... neck strain, or what we would call cervical spine strain, and that strain [was] resolved." Their examination found that Miller had a preexisting degenerative condition in his back, and that his range of motion was normal for someone suffering from that condition. In addition, they concluded that Miller's physical capacity had not been permanently reduced by the accident and that he would have been able to fly a small airplane after July 2001. One of the State's experts, Dr. Stephen Marble, a rehabilitation specialist, described Miller's regimen of pain medication as "excessive" in light of his injuries from the plane accident.

Gallela, an economist, testified that the accident adversely affected Miller's earning capacity by "relegat[ing] him to light or medium work ... jobs." Based on a comparison between his previous wages and the average wages of the jobs he could now perform, Gallela determined that Miller's lost earning capacity amounted to $340,431. He calculated several other categories of economic losses, including retirement benefits, contributions to Miller's subsistence, and other household contributions. His calculations, discussed in a letter dated May 27, 2003, assumed that Miller would be leaving his FAA job "to seek employment suitable to his physical condition" on January 1, 2004. The total (including both expected losses and losses that Miller would already have sustained by the time of trial) was over $1 million.

### D. Additional Work in Late 2003

In August 2003 Miller left the FAA without leave for between three and four weeks to work for a private contractor in Eek. But he did not mention this to Dr. Levine, the doctor who was treating him at the time. Instead, he led Dr. Levine to believe that he was staying home. The Eek contractor—Miller's brother-in-law—paid him roughly $16,000 to work as a barge foreman on a construction project. The parties dispute the

---

**3.** Dr. Levine testified that this procedure involved "put[ting] needles into the disc space," one of which would go to the bone, and "gradu-

ally inject[ing] a little bit of dye under pressure and record[ing] the pressure[,] as well as visually look[ing] and see[ing] what the disc is doing."

nature and intensity of the work, with Miller claiming that he generally did not do physically strenuous work, and the State alleging that he worked an average of thirteen hours a day for three weeks and went moose hunting after the job was completed. Miller testified that this job was not an accurate indication of his future earning potential, as similar positions would likely not be available in the future.

In September 2003 the FAA took possession of an all-terrain vehicle (ATV) that Miller had shipped to himself at the Bethel airport. The FAA, which claimed that it owned the vehicle, began investigating Miller's "apparent theft attempt." [4] The following month, it demanded Miller's medical records and threatened him with termination if he remained absent without leave. Miller resigned shortly thereafter.

### E. Procedural History

Although the trial was originally scheduled to begin in August 2003, the State moved for a continuance when the assistant attorney general assigned to the case was called to active military duty. The superior court granted this motion over Miller's objection, rescheduling the trial for May 2004. Discovery, which had already been conducted, was not reopened. When Miller filed a cross-motion for summary judgment seven weeks after the court's deadline, and claimed that it was late because he had not received certain evidence until after the filing deadline, the court declined to accept the motion.

In March 2004 a new assistant attorney general entered an appearance for the State. This attorney sought evidence on three new matters, including surgical diagnostic procedures performed by Dr. Levine, Miller's work for a private contractor in August and September 2003, and the circumstances of Miller's resignation from the FAA. The State also sought discovery on an independent medical examination conducted in Seattle. This exam was included in Miller's workers' compensation records, which Miller had given the State permission to obtain in Novem-

ber 2002. The State requested Miller's records in January 2003, received no response, and did not make a second request until February 2004. It then received the records.

On April 27, 2004, less than a month before the scheduled trial date, the State moved for a continuance to conduct additional discovery on these issues. Miller opposed this motion, arguing that "every discovery issue that the State complains about has either been remedied, or is due to the State's failure[ ] to timely seek discovery long before now."

The superior court denied the motion for a continuance, noting that the new issues "may be extremely relevant," but finding that the State had not been diligent in following up on them. But when the State moved for reconsideration, the court reached the opposite result:

> In denying the defendants[']][m]otion for a[c]ontinuance, the court was legitimately concerned with preventing further delay of the trial because the defendants had failed to be diligent in their discovery efforts. However, after review[,] ... it is apparent that the defendants were diligent in their efforts.

Asserting that "obvious prejudice ... [would] result to the defendants if they [were] forced to go to trial without being able to fairly present these issues," the court granted a continuance and reopened discovery for ninety days.

Miller moved for reconsideration, maintaining that some of the documents sought by the State were not in his possession and pointing out that the court's previous order had "failed to acknowledge or weigh the prejudice [caused] to the plaintiffs by a second continuance." In response, the court reversed itself yet again:

> While the defense raises valid concerns of discovery and disclosure issues, upon further review and consideration, the court is unable to determine what prejudice the defendant[ ] will actually suffer because at this time the court cannot determine exactly what the disputed facts will show. The

---

4. The investigation appears not to have resulted in criminal charges. Miller testified at trial that he had purchased the ATV from a dishonest seller and had only learned that it did not belong to the seller when the FAA confiscated it.

court is better able to determine these issues after the evidence has been presented at trial and the court will obviously entertain post-trial motions if it becomes necessary. The plaintiffs will suffer prejudice if the trial is continued, and in view of the fact [that] this is the defendant['s] second continuance, the plaintiffs['] motion for reconsideration is GRANTED.

The State sought an emergency stay from this court, but its motion was denied.[5]

The following week, when the superior court convened for jury selection, the State moved for the superior court judge to voluntarily recuse himself on the ground that the court's series of contradictory orders had seriously prejudiced its case. Although the court denied the motion, it conceded that it had "seemed a little schizophrenic" with regard to the motion to continue, and attempted to explain why:

> Clearly there [are], I think, really good arguments on both sides[,] with plaintiffs ... having already given up one continuance with strong objection last year, and then with the agreement that discovery would close. And at the same time, the red flags raised by the defense regarding information they don't feel like they'll have, it would cause them not to be able to present their case fairly.

> Being a relatively new judge, I have conferred with what I consider some other ... wiser judges or more experienced judges ... and I was getting different advice from various judges. And that changed over time, and I think some of the advice I was relying on I had forgotten to mention that there had already been a previous continuance for the defense granted. And obviously, I'm not letting other judges make my decisions. I've pondered this. If I got paid by the hour ... I wouldn't be rich, but maybe I'd be making more than my salary.

... Clearly there are remedies to the defense if the evidence comes in that causes the [s]tate not to be able ... to present their case fairly. It's difficult for the [c]ourt to predict the future and what exactly was controverted in what would be admitted. So that may explain a little bit of [the] stop and go [orders].

The case proceeded to trial.

Evidence about the Seattle medical exam and the three new issues was introduced at trial. The State received a copy of the Seattle medical examination report, and, although it was not admitted into evidence, the State was permitted to question two of the testifying physicians about it. Dr. Levine gave detailed testimony about his diagnostic procedures, including the provocative discography, and testified that Miller had deceived him about his whereabouts in August and September 2003. Similarly, Miller testified to having worked in Eek and stated that he "attempt[ed] to ship a four-wheeler" home with him. He admitted that it had been confiscated under suspicion of theft, but claimed that he had been "sold a machine that wasn't someone else's to sell." The State had the FAA's notes about the investigation of the alleged ATV theft, and the FAA's letter to Miller about his unauthorized leave of absence. These items were introduced as exhibits when the State moved for additional discovery time, but do not appear to have been admitted into evidence at trial.

After Miller had presented his evidence, the State moved for a directed verdict on the ground that there was no evidence that it had notice about the condition of the north windsock,[6] or alternatively, on the ground that the NOTAM constituted a sufficient warning. This motion was denied. The jury was then given a series of instructions detailing Miller's claims, the definitions of negligence and causation, and the method of calculating economic damages. One of the

---

5. Although we pointed out the "stop-and-go" character of the superior court's orders in our order denying the stay motion, we also noted that "review of the superior court's order under the applicable standard of review, abuse of discretion, would not be likely to result in a conclusion that the court abused its discretion in denying a continuance."

6. The motion did not discuss the testimony of the DOTPF employee who maintained that the sock was leaning to one side and that he repeatedly used pieces of wood to prop it up.

instructions stated that the "alleged acts of negligence include failures to maintain the south windsock pole and attachments, or failure to warn and issue accurate notices to the public of defects and hazards," and then listed the conditions under which the jury could find that Miller was entitled to recover. The following instruction, using similar wording, discussed Miller's claim regarding the north windsock. Another instruction explained the concept of comparative negligence. In addition, an instruction informed the jury that Miller was "not seeking damages related to [his] voluntary decision to leave his employment with the FAA," but stated that the jury could "award the plaintiff a fair amount for any reduction in future ability to earn money that he is reasonably probable to experience." A mitigation instruction was also given: "Plaintiff is not entitled to be paid for any loss or for any part of any loss he could have avoided with reasonable efforts and without und[ue] risk, hardship, or embarrassment, even though the loss originally resulted from an act or omission for which the defendant is legally responsible."

The jury ultimately concluded that the State had been negligent and that its negligence was the legal cause of Miller's injuries. Concluding that Miller had not been negligent, it awarded Miller $1,256,000 and awarded his wife $20,000. Although Miller's children were listed as plaintiffs, the jury declined to award them damages. The State's subsequent motion for JNOV was denied,[7] and this appeal followed.

7. This motion relied on arguments similar to those put forward in the State's motion for a directed verdict.

8. Neal & Co., Inc. v. City of Dillingham, 923 P.2d 89, 94 n. 6 (Alaska 1996); House v. House, 779 P.2d 1204, 1206 (Alaska 1989); Siggelkow v. Siggelkow, 643 P.2d 985, 986 (Alaska 1982).

9. House, 779 P.2d at 1206 (quoting Barrett v. Gagnon, 516 P.2d 1202, 1203 (Alaska 1973)); see also House, 779 P.2d at 1207 (noting that we "will not lightly overturn a lower court's decision which was based on a review of all the relevant evidence and in which the complaining party had reasonable opportunity in court to introduce evidence and contest the other side's evidence").

## III.  DISCUSSION

### A.  Standards of Review

■■■ A trial court's decision to deny a continuance is reviewed for abuse of discretion.[8] An abuse of discretion exists if "a party has been 'deprived of a substantial right or seriously prejudiced by the lower court's ruling,'"[9] a determination that must be made in light of "[t]he particular facts and circumstances of each case."[10]

■■■ We "will affirm a trial court's denial of a motion for [JNOV] unless 'the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts.'"[11] In our review of the trial court's ruling on a motion for JNOV, we will not weigh conflicting evidence, or judge the credibility of witnesses.[12]

■■■ With regard to a superior court's jury instructions, we "apply our independent judgment to determine whether the challenged or refused instruction states the law correctly."[13] Giving an erroneous jury instruction constitutes prejudicial error if it probably affected the verdict.[14] Finally, determinations regarding the admissibility of evidence are generally within the discretion of the trial court and "will not be disturbed absent an abuse of discretion."[15]

### B.  The Trial Court's Denial of a Continuance

■■■ The State argues that both the process of trial preparation and the substance of its case were prejudiced by the trial court's

10. Siggelkow, 643 P.2d at 987.

11. Getchell v. Lodge, 65 P.3d 50, 53 (Alaska 2003) (quoting Lynden Inc. v. Walker, 30 P.3d 609, 612 (Alaska 2001)).

12. Blumenshine v. Baptiste, 869 P.2d 470, 473 n. 3 (Alaska 1994).

13. City of Kodiak v. Samaniego, 83 P.3d 1077, 1082 (Alaska 2004).

14. Id.

15. Alderman v. Iditarod Props., Inc., 104 P.3d 136, 140 (Alaska 2004).

denial of a continuance. By waiting to rule on the State's motion until weeks before trial, and then issuing a series of contradictory rulings in the days immediately before trial, the superior court allegedly led the State to squander crucial trial preparation time. The State appears to be making two separate arguments here. One argument, more implicit than explicit, is that the State was effectively denied notice of the trial date during the two-day period between the trial court's May 19 decision to delay the trial and its final order reinstating the trial date of May 24. But Miller filed his own motion for reconsideration later on May 19, so the State could not have been unaware of the possibility that trial could still begin on May 24. Thus, out of a period stretching back to the summer of 2003, when the May 2004 trial date was set, the State lost a maximum of two days and, even during those two days, it had reason to continue preparing for trial.

■ The State's second argument is that the trial court's decision to deny further discovery prevented it from presenting its case with regard to four allegedly new matters that "substantially changed the trial picture." As the *Siggelkow* court explained, review of a trial court's decision to deny a continuance hinges on "[t]he particular facts and circumstances of each case,"[16] and implicates competing policy considerations. A court's efforts to avoid delay "should not prejudice the substantial rights of parties by forcing them to go to trial without being able to fairly present their case."[17] But the "necessity for orderly, prompt and effective disposition of litigation and the loss and hardship to the parties ... as well as to witnesses" compel trial judges "to insist upon cases being heard and determined with as [much] promptness as the exigencies of the case will permit."[18] This need is particularly pressing in cases that have already been subject to substantial delay.[19]

Although the trial court could have been more decisive in its handling of the continuance issue, it did not "force [the State] to go to trial without being able to fairly present [its] case."[20] By the time of trial, the State had conducted sufficient preparation to present its core case—that it did not negligently cause Miller's accident—and bring the four new issues to the attention of the jury.

As a threshold matter, it is not clear that the Seattle medical report was a "new" issue at all, since the State could have obtained a copy as early as November 2002 and attempted to do so in January 2003. The record is silent as to why the State waited over a year to follow up on this request, and the State conceded at oral argument that it "could have, with more diligence, obtained the record earlier." It ultimately obtained a copy of the report in March 2004 and questioned two of the testifying physicians about it.[21]

The other three issues were also brought to the jury's attention. Dr. Levine gave detailed testimony about the provocative discography, and also testified that Miller had deceived him about his whereabouts in Au-

---

16. 643 P.2d at 987.

17. *Id.*

18. *Id.* (quoting *Kalmus v. Kalmus*, 103 Cal. App.2d 405, 230 P.2d 57, 63 (1951), *partially overturned on other grounds by Hudson v. Hudson*, 52 Cal.2d 735, 344 P.2d 295, 296–97 (1959)).

19. *Cf. Neal & Co., Inc.*, 923 P.2d at 95 (holding that decision to deny continuance after five years of litigation "was not an abuse of discretion ... at that late point in the litigation").

20. *Id.*

21. The State points out that the court did not admit the report itself and that the stop-and-go orders interfered with its efforts to call an expert to testify about the report. But it cites no authority in support of the proposition that the court erred in declining to admit the report. Furthermore, the record does not establish that the absence of the report itself, and of an additional witness's testimony about it, had any effect on the result. *See Fleegel v. Estate of Boyles*, 61 P.3d 1267, 1270 (Alaska 2002) ("We will only reverse evidentiary rulings if upon review of the record as a whole we are left with the definite and firm conviction that the trial court erred in its ruling and the error affected the substantial rights of a party."); *House*, 779 P.2d at 1206 ("This court will not disturb a trial court's refusal to grant a continuance unless ... a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling.") (citations and quotation marks omitted).

gust and September 2003. Miller himself testified that he had worked in Eek and had attempted to ship an ATV to himself. Although he claimed to have been deceived by the seller, he admitted that it had been confiscated, and acknowledged that he did not know if it had been stolen. Thus, the four issues that the State expected to "substantially change[ ] the trial picture" were in fact presented at trial. They simply failed to persuade the jury.[22]

Moreover, the trial court's final order on the continuance indicated a willingness to revisit the underlying issues and entertain further motions to cure any prejudice resulting from insufficient discovery. During trial, the superior court considered—and granted—motions directed at ameliorating any prejudice resulting from the denial of a continuance. For example, it granted the State a one-day continuance at the beginning of the trial to compensate for the abruptness of its final order denying a long-term continuance. Thus, far from being indifferent to the State's ability to present its case, the trial court appears to have guarded against any prejudice that might result from its earlier ruling.

Finally, the continuance requested by the State would have been the second in a case where the trial date had already been delayed by nearly a year. It is not clear that the State made good use of this time, as the new assistant attorney general did not enter an appearance until March 2004. Furthermore, by May 2004, witnesses' memories of the incident, and of the conditions at the Kipnuk airport, were over three years old. The delay entailed by reopening discovery would likely have been a lengthy one. As we noted, the State did not request a short stay.

In addition to the obvious dangers of deteriorating evidence and fading memories, the requested delay would also have entailed new travel arrangements for witnesses—an important consideration for a trial held in Bethel. In these circumstances, the "necessity for orderly, prompt and effective disposition of litigation and the [potential] loss and hardship to the parties ... as well as to witnesses"[23] supported the trial court's ultimate decision to deny a continuance. Because the State has not shown that this decision deprived it of a substantial right, we hold that the denial of a continuance did not constitute an abuse of discretion.[24]

### C. Jury Instructions

#### 1. The south windsock

■ The State also claims that the trial court erred regarding two jury instructions. First, in describing Miller's complaint, the court noted that the "alleged acts of negligence include failures to maintain the south windsock pole and attachments, or failure to warn ... the public of defects," and immediately listed the conditions under which the State could be held liable.[25]

■ Because the south windsock was not standing, and was the subject of a NOTAM warning of its unreliability, it is difficult to imagine that it, in isolation, could have been a legal cause of Miller's accident. But, as Miller notes, a particular jury instruction should be viewed in the context of other instructions given to the jury.[26] Here, a similar instruction was given regarding the north windsock. And, as noted at oral argument, the two instructions were given separately at the State's request. Read together, the two instructions describe a claim that the State was negligent in its operation of the

---

22. *Cf. House,* 779 P.2d at 1207 ("Inability to mount a successful case does not mean that ... an abuse of discretion occurred.").

23. *Siggelkow,* 643 P.2d at 987 (quoting *Kalmus,* 230 P.2d at 63).

24. *Cf. House,* 779 P.2d at 1207 (declining to "lightly overturn a lower court's decision which was based on a review of all the relevant evidence and in which the complaining party had reasonable opportunity in court to introduce evidence and contest the other side's evidence").

25. The State did not discuss this jury instruction in its motion for directed verdict or motion for JNOV, but it did present its underlying argument—that its duty regarding the south windsock had been satisfied by publishing a warning—in its motion for JNOV.

26. *See Lynden Inc.,* 30 P.3d at 617 ("Jury instructions are to be analyzed as a whole, rather than in isolation.").

airport as a whole, and that this negligence resulted in a breach of the duty the State assumed when it constructed the windsocks.[27] The instructions also explained that Miller would not be entitled to recovery unless the jury found that three conditions were met: (1) the State was negligent; (2) the State's negligence was a "legal cause" of Miller's harm; and (3) Miller suffered actual harm. In a subsequent instruction, the court defined "legal cause" as a "substantial factor in bringing about the harm," such that "the act or failure to act was so important in bringing about the harm that a reasonable person would regard it as a cause and attach responsibility to it[,] and . . . the harm would not have occurred but for the act or failure to act."

In view of the evidence about the role of windsocks and the condition of the airport, a reasonable jury could easily have found that all three conditions were met. The jury heard testimony that windsocks were essential to airport safety and that a malfunctioning windsock was as dangerous as a malfunctioning traffic light. As the State aviation director testified, "if the pilot is coming into an unattended airport, [he or she has] little other [than a windsock] . . . to determine what the wind direction is."[28] In an airport where one of two windsocks is obviously not functioning, pilots would be forced to rely entirely on the other sock—a conclusion supported by Miller's testimony that he circled around twice, looking carefully at the north windsock. A reasonable jury could therefore have concluded that the lack of a south windsock made the airport more dangerous by heightening reliance on the north windsock. For this reason, viewing both the jury instructions and the condition of the airport "as a whole, rather than in isolation,"[29] we hold that the trial court did not err by instructing the jury on the south windsock.

### 2. Loss of earning capacity

■■■ The State also claims that the court erred in permitting the jury to consider Miller's lost earning capacity after Miller had stipulated that he was not seeking damages related to his decision to leave the FAA. As the State points out, Miller continued working for the FAA for approximately three years after the accident and, even though the nature of his work changed, his pay remained the same. When he did resign, he did so in the context of an investigation into a lengthy, unexplained absence, and the possible theft of an ATV.[30]

■■■ But an award for lost earning capacity, which provides compensation for a "permanent diminution of the ability to earn money,"[31] is distinct from an award of actual lost earnings.[32] A plaintiff whose actual lost earnings are negligible or nonexistent may still be compensated for lost earning capacity, even where the lack of actual earnings is a result of the plaintiff's own choices.[33]

---

27. *See City of Seward v. Afognak Logging*, 31 P.3d 780, 784 (Alaska 2001) ("We have long recognized that a duty of reasonable care generally arises when a person undertakes an action and that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.' ") (quoting *Moloso v. State*, 644 P.2d 205, 212 (Alaska 1982)).

28. He also noted that the State should have "put the [south] windsock back up."

29. *Lynden Inc.*, 30 P.3d at 617.

30. The State also appeals the trial court's decision to admit Gallela's testimony about Miller's lost earning capacity. In support of this argument, it relies on Miller's stipulation that he left his position voluntarily (and therefore would not be pursuing a lost earnings claim). As the superior court noted, however, Miller did not waive his claim for lost earning capacity, a type of

economic damages different from actual lost earnings.

31. *Grimes v. Haslett*, 641 P.2d 813, 818 (Alaska 1982) (quoting *City of Fairbanks v. Nesbett*, 432 P.2d 607, 617 (Alaska 1967)).

32. Cf. *Anderson v. Litzenberg*, 115 Md.App. 549, 694 A.2d 150, 161 (1997) ("Impairment of earning capacity is measured by the lost *capacity* to earn, rather than what a plaintiff would have earned.") (citation and quotation marks omitted).

33. *See, e.g., Am. Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1342 (Alaska 1982) (affirming a superior court's decision to instruct the jury on lost earning capacity for a plaintiff with negligible actual earnings, and rejecting the defendant's argument that the plaintiff "had no . . . [earning] capacity, because she had worked for [a] family-owned business for many years for an almost nominal salary"); *Grimes*, 641 P.2d at

Moreover, a plaintiff's duty to mitigate does not extend to accepting a position that entails great hardship or personal embarrassment.[34] For this reason, the relevant inquiry is not whether Miller voluntarily resigned from the FAA, but rather, whether Miller's long-term earning capacity was reduced by the accident and whether Miller mitigated his damages.

The record contains conflicting evidence on this point. On the one hand, Miller remained an employee of the FAA for approximately three years after the accident. Had he not taken an unauthorized leave of absence and attempted to ship a government-owned ATV to himself, it is possible that he would have been able to remain at the FAA indefinitely. On the other hand, his new duties consisted largely of "sit[ting] [at] his desk with nothing to do" and, according to Gallela, it was "clear to [Miller] that [the] FAA did not want him there since he couldn't do his job." If the accident had permanently deprived Miller of his ability to do his job, and if the FAA had no other substantive work for him, it is unlikely that the agency would have given him an indefinite sinecure.[35] Even if it had, holding a job with no significant responsibilities could be a source of embarrassment to some-

one who maintained that he previously had derived pride from the usefulness of his work.[36] The "light work"[37] that Miller was actually capable of performing paid significantly less than his FAA salary. Based on this evidence, a reasonable jury could have found that Miller was entitled to damages for reduced earning capacity.

Moreover, the trial court gave a mitigation of damages instruction. The State was free to argue that Miller's decision to leave the FAA voluntarily despite the higher pay represented a failure to mitigate his damages.[38] We therefore hold that the trial court did not err in giving an instruction on future earning capacity.[39]

### D. Motion for JNOV

The State also claims that the court erred in denying its motion for JNOV. A superior court's denial of a motion for JNOV must be affirmed unless "the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts."[40] Here, the central issue of fact is

818 n. 3 (citing *Morrison v. State*, 516 P.2d 402, 405 (Alaska 1973) for the proposition that "[t]he right of an injured homemaker to recover for impaired earning capacity regardless of whether she was employed before the injury exemplifies the distinction between an award for lost earnings and an award for lost earning capacity").

34. *See Univ. of Alaska v. Chauvin*, 521 P.2d 1234, 1240 (Alaska 1974) (noting that a university employee alleging breach of contract was required to mitigate his damages "if it did not involve embarrassment or hardship," and holding that the employee was not required to take an untenured position that was not comparable to his previous job). Here, the jury was instructed that the "[p]laintiff is not entitled to be paid for any loss or for any part of any loss he could have avoided with reasonable efforts and without und[ue] risk, hardship, or embarrassment, even though the loss originally resulted from an act or omission for which the defendant is legally responsible."

35. Gallela's calculations assumed that Miller would be leaving his FAA job "to seek employment suitable to his physical condition" on January 1, 2004. Miller's actual resignation occurred shortly after the FAA began investigating him in the fall of 2003.

36. *Cf. Chauvin*, 521 P.2d at 1240. According to Gallela, having nothing to do at work "wore pretty heavily" on Miller.

37. The work that Miller was capable of performing was itself the subject of conflicting evidence. While a physician called by Miller testified that Miller was capable of working in "either sedentary or light positions" and might need further medical treatment, the State's physician found that Miller's physical capacity had not been permanently reduced by the accident, and that he would have been able to fly a small airplane after July 2001.

38. *Cf. Oost–Lievense v. N. Am. Consortium, P.C.*, 969 F.Supp. 874, 881 n. 3 (S.D.N.Y.1997) (noting, in the context of an action for breach of employment contract, that the defendants were "free to argue at trial that plaintiff has failed to mitigate his damages ..., as the question of damages is for the jury").

39. *Cf. Am. Nat. Watermattress Corp.*, 642 P.2d at 1342.

40. *Lynden Inc.*, 30 P.3d at 612 (citation omitted).

whether the State complied with its duty to "use due care to guard against unreasonable risks created by dangerous conditions." [41]

 Although the State is correct to point out that no federal or state law imposed a duty to install windsocks, there is no dispute that it installed them at the Kipnuk airport. By doing so, and inducing pilots to rely on them for safety, the State undertook a duty to maintain the windsocks, or warn if they were malfunctioning.[42] The NOTAM, which indicated that the south windsock was "damaged [and] not functioning properly," arguably fulfilled the State's duty with regard to that windsock in isolation. But Miller's claim was based on the overall condition of the airport.[43] At trial, Miller testified that he had relied on the north windsock in determining whether he could safely land—a reliance that was likely heightened by the lack of a south windsock. A DOTPF worker in Kipnuk testified that he sometimes used wooden boards to prop the sock up, but that the boards would rot quickly. He also maintained that he "always report[ed] everything" about the sock's condition to his superiors. Viewed in the light most favorable to Miller,[44] this evidence would permit a reasonable person to conclude that the State was aware that its actions had created a dangerous condition at the Kipnuk airport and that it failed to remedy or warn about this condition. For that reason, we affirm the superior court's denial of JNOV.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the superior court.

---

41. *City of Seward,* 31 P.3d at 784 (quoting *Guerrero v. Alaska Housing Fin. Corp.,* 6 P.3d 250, 255–56 (Alaska 2000)).

42. *See City of Seward,* 31 P.3d at 784 ("We have long recognized that a duty of reasonable care generally arises when a person undertakes an action and that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.' ") (quoting *Moloso v. State,* 644 P.2d 205, 212 (Alaska 1982)). A landowner's duty regarding a dangerous condition can generally be satisfied by either remedying the condition or warning those who are likely to encounter it. *Cf. Schroeder v. St. Louis Coun-*

*ty,* 708 N.W.2d 497, 511 (Minn.2006) (discussing a municipality's "duty to remedy or warn of dangerous conditions" on its roads).

43. *See City of Seward,* 31 P.3d at 784 n. 12 (noting that whether a defendant's actions constitute negligence depends on "all [of] the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk") (citing *Webb v. City of Sitka,* 561 P.2d 731, 732–33 (Alaska 1977)).

44. *Lynden Inc.,* 30 P.3d at 612.